**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Douglas John Zolnierz,<br><br>                    Plaintiff,<br><br>v.<br><br>Joseph Arpaio, Sheriff of Maricopa County; Fulton Brock; Don Stapley; Andrew Kunasek; Max Wilson; Mary Rose Wilcox; Board of Maricopa County Supervisors; Betty Adams, Director of Maricopa County Correctional Health Services; Dr. R. Venkatabalaji, Director of Jail Medical Review Board, et al.,<br><br>                    Defendants. | No. CV-11-00146-PHX-GMS<br><br>**ORDER** |

The remaining Defendant in this case, Dr. Sudha Rao, has moved for summary judgment on Plaintiff Douglas Zolnierz's remaining claim. (Doc. 185). Oral argument on the Motion was held on August 19, 2013. The Court grants summary judgment in favor of Dr. Rao for the reasons described below.

**FACTUAL BACKGROUND**

Zolnierz was a pre-trial detainee at the Maricopa County Fourth Avenue Jail for almost ten months in 2009. (Doc. 186 ¶ 1; Doc. 225 ¶ 1.) He brought a number of claims against a number of defendants based on his treatment there. The only remaining claim is that Dr. Rao was deliberately indifferent to Zolnierz's needs in violation of the Eighth Amendment.

Zolnierz arrived at the Jail on January 16, 2009. (*Id.*) All new inmates pass

through Intake Screening, handled by nurses from Maricopa County Correctional Health Services (CHS). (Doc. 186 ¶ 8; Doc. 225 ¶ 8.) During his intake screening, Zolnierz reported that he was diabetic, had been treated for mental illness, and was prescribed diabetic, blood pressure, and psychiatric medications prior to entering the Jail. (Doc. 186 ¶ 9; Doc. 225 ¶ 9.) Although the intake forms report no other condition, Zolnierz claims that he also reported liver disease, hepatitis C, and cirrhosis. (Doc. 186-5, Ex. 3 (Ex. A) at MC-CHS-00070–72; Doc. 226-1, Ex. 1 (Zolnierz Decl.) ¶ 4.) CHS nurses ordered daily blood sugar checks (Accuchecks) in response to Zolnierz's self-reported diabetes. (Doc. 186 ¶ 10; Doc. 225 ¶ 10.) They also reviewed the prescriptions that Zolnierz had before incarceration, but did not provide those medications to Zolnierz at that time or at any time during his stay at the Jail. (*Id.*; Doc. 226-1, Ex. 1 Zolnierz Decl.) ¶ 5; Doc. 186-2, Ex. 2 (Ex. A) at MC-CHS-00373, -00376; Doc. 186-3, Ex. 3 (Ex. A) at MC-CHS-00017, -00026.)

Since 1998, Dr. Rao has been licensed to practice medicine in Arizona and has served as a CHS medical staff physician. (Doc. 186 ¶ 2; Doc. 225 ¶ 2.) Her duties as a CHS medical staff physician include conducting Initial Health Assessments of inmate patients, managing and treating inmate patients' medical conditions, and referring cases to the CHS Medical Director for final clinical decision making. (*Id.*)

Dr. Rao met with Zolnierz for his Initial Health Assessment on February 3, 2009. (Doc. 186 ¶ 11; Doc. 225 ¶ 11.) She reviewed Zolnierz's Intake Screening and pre-incarceration prescriptions. (Doc. 186 ¶ 12; Doc. 225 ¶ 12.) She noted that Zolnierz's blood glucose levels had been within normal ranges while in the Jail, although Zolnierz now argues that his medical records show otherwise. (*Id.*) During the Assessment, Zolnierz provided additional medical history, including his prior diagnoses of cirrhosis and Hepatitis C. (*Id.*) Dr. Rao examined a complete metabolic profile (CMP) that showed a stable liver, and ordered a follow-up CMP. (*Id.*) She solicited Zolnierz's medical records from his outside doctors and conducted a physical examination that was

unremarkable. (*Id.*) Zolnierz's outside medical records revealed a long history of treatment for serious mental illness, such as paranoia, persecutory ideations, auditory hallucinations, manic episodes, depression, pressured speech, confrontational volatility, and irritability. (Doc. 186 ¶ 14; Doc. 225 ¶ 14.) Zolnierz had a history of alcohol and drug abuse and had been non-compliant with mental health treatment plans. (*Id.*) The records also showed that Zolnierz was diagnosed with cirrhosis and Hepatitis C in 2001. (Doc. 186 ¶ 15; Doc. 225 ¶ 15.) No record showed decompensated end stage liver disease symptoms, however. (Doc. 186 ¶ 16; Doc. 225 ¶ 16.)

Based on the Initial Health Assessment, Dr. Rao's plan for Zolnierz's diabetes and liver disease (cirrhosis and Hepatitis C) was to have periodic testing of his blood sugars and liver function accompanied by clinical follow-ups. (Doc. 186 ¶ 24; Doc. 225 ¶ 24.) According to Dr. Rao, Zolnierz did not need a CHS special needs plan or qualify under the CHS Chronic Disease policy because his blood sugars were consistently at normal levels and his liver disease/cirrhosis had not progressed to a decompensated status. (Doc. 186-1, Ex. 1 (Rao Aff.) ¶ 28.) If the tests revealed anything of note, Zolnierz would be re-assessed to determine whether the plan needed to change. (*Id.*)

Zolnierz complained twice in an inmate grievance on January 25, 2009, that CHS had not prescribed diabetic pills. (Doc. 186 ¶ 25; Doc. 225 ¶ 25.) CHS nursing staff, supervisors, or quality management personnel were in charge of reviewing and responding to these grievances, and CHS informed Zolnierz that he was not prescribed any medication because his blood sugars were normal. (*Id.*) Zolnierz signed the resolution. (*Id.*) Dr. Rao was not involved in resolving this grievance.

CHS staff reviewed Zolnierz's CMP results on February 12, 2009, and found that Zolnierz's blood sugar was within normal limits and his liver function was stable. (Doc. 186-4, Ex. 3, Ex. A at MC-CHS-0049.) Dr. Rao ordered CHS to tell Zolnierz that his blood sugars were at normal levels. (Doc. 186 ¶ 28; Doc. 225 ¶ 28.)

Zolnierz requested diabetic monitoring on a daily basis on April 3, 2009. (Doc.

186 ¶ 32; Doc. 225 ¶ 32.) Dr. Rao met with him and told him that his blood sugars were consistently normal and that any diabetic medication or other treatment was unwarranted. (Doc. 186-1, Ex. 1 (Rao Aff.) ¶ 35.) She told him that CHS would continue to run periodic CMPs. (Doc. 186 ¶ 33; Doc. 225 ¶ 33.) Zolnierz acknowledged his understanding. (*Id.*) Zolnierz had questions again about his diabetes on May 11, 2009. (Doc. 186 ¶ 36; Doc. 225 ¶ 36.) Once again, Dr. Rao told Zolnierz that his blood glucose levels were within normal limits and ordered another CMP. (*Id.*)

On June 24, 2009, Zolnierz underwent a single ammonia level test by order of the CHS psychiatrist. (Doc. 186 ¶ 53; Doc. 225 ¶ 53.) The test showed elevated results. (*Id.*) Dr. Rao met with Zolnierz on the basis of the elevated results. (*Id.*) At the meeting, Zolnierz denied confusion, agitation, any change in mental status or functioning, bleeding, constipation, diarrhea, dehydration, or infections. (*Id.*) A physical examination was unremarkable. (*Id.*) Based on these observations, Dr. Rao concluded that Zolnierz did not present with clinical hepatic encephalopathy. (*Id.*) Nevertheless, Dr. Rao consulted with the CHS psychiatrist and determined that they would offer a trial of lactulose for the possible sub-clinical (grade one) hepatic encephalopathy. (Doc. 186 ¶¶ 54–55; Doc. 225 ¶¶ 54–55.) Dr. Rao also ordered another CMP to monitor Zolnierz's liver function, along with other tests. (*Id.*) Dr. Rao met with Zolnierz on July 16, 2009, and claims she offered a trial of lactulose. (Doc. 186-2 (Rao Aff.) ¶ 56.) Zolnierz does not recall that she made such an offer. (Doc. 226-1, Ex. 1 (Zolnierz Decl.) ¶ 13.)

Dr. Rao claims that Zolnierz did not present with altered medical status or other symptoms of hepatic encephalopathy while in the Jail. (Doc. 186-1, Ex. 2 (Rao Aff.) ¶ 58.) Zolnierz claims that he experienced at this time a variety of symptoms that he associates with hepatic encephalopathy: confusion, delirium, inability to bathe without help, urinary incontinence. (Doc. 226-1, Ex. 1 (Zolnierz Decl.) ¶ 12.) Dr. Rao did not order any additional testing specific to hepatic encephalopathy. (Doc. 186 ¶ 57; Doc. 225 ¶ 57.)

- 4 -

From January 16 through November 3, 2009, CHS obtained at least seven CMPs to monitor Zolnierz's blood sugars and liver function. (Doc. 186 ¶ 58; Doc. 225 ¶ 58.) Dr. Rao claims that these tests showed consistently normal limits for blood sugars and stability for compensated cirrhosis. (Doc. 186-1 ¶¶ 15, 16, 28, 30, 31, 35, 38.) Zolnierz departed the Jail and entered the control of the Arizona Department of Corrections on November 4, 2009.

## DISCUSSION

### I.   LEGAL STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted).

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); see also L.R.Civ. 1.10(l)(1) ("Any party opposing a motion for summary judgment must . . . set[ ] forth the specific facts, which the opposing party asserts, including those facts which establish a genuine issue of material fact precluding summary judgment in favor of the moving party."). If the nonmoving party's opposition fails to specifically cite to materials either in the court's record or not in the record, the court is not required to either search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028–29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417–18 (9th Cir. 1988).

## II. ANALYSIS

### A. Evidentiary Issues

Dr. Rao objected on numerous grounds, (Doc. 232), to the admissibility or supportability of almost all of the facts that Zolnierz set forth in his Separate Statement of Facts, (Doc. 225). Zolnierz sought leave to respond to those objections, (Doc. 241), which the Court granted.

Those objections, for the most part, are meritless. Dr. Rao claims first that the medical records Zolnierz cites are not properly authenticated. But there is no requirement to authenticate records in response to a summary judgment motion. Rule 56(c)(2) allows a party to object only on the basis that "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Both the third-party medical records and the medical records from the MCSO were produced by Dr. Rao, along with the custodian's authentication. No serious argument can be made that the third

party medical records cannot be presented in a form that would be admissible in evidence. As for the deposition testimony, Zolnierz relies only on the deposition transcripts that Dr. Rao has already produced and relied upon in her Motion. Again, no serious argument can be made that the deposition transcripts are not what they purport to be.

To the extent Dr. Rao objects on foundation grounds to the Declaration of Joseph Mais, (Doc. 226), in which he states that the attachments to the Separate Statement of Facts are "true and correct copies," that objection has no real bearing on Zolnierz's ability to rely on those documents. As discussed above, there is no real dispute that each document could be presented in a form that would be admissible in evidence. Dr. Rao's objections to the evidence on authentication grounds are overruled.

### B.     Merits

Zolnierz's claim arises under 42 U.S.C. § 1983. Section 1983 provides a cause of action for persons who have been deprived of their constitutional rights by persons acting under color of law.[1] Section 1983 "is not itself a source of substantive rights" but only provides a cause of action "for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Section 1983 "imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker*, 443 U.S. at 146.

Zolnierz asserts an Eighth Amendment violation. Prison officials "violate a prisoner's Eighth Amendment rights if they are deliberately indifferent to his serious

---

[1] The Section reads, in full: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia." 42 U.S.C. § 1983.

- 7 -

medical needs." *Anderson v. County of Kern*, 45 F.3d 1310, 1316 (9th Cir. 1995) (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)). Deliberate indifference "may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (citing *Estelle*, 429 U.S. at 104–05). The indifference to medical needs, however, "must be substantial; a constitutional violation is not established by negligence or 'an inadvertent failure to provide adequate medical care.'" *Anderson*, 45 F.3d at 1310 (quoting *Estelle*, 429 U.S. at 105–06); *see Hutchinson*, 838 F.2d at 394 ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights.") *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ("[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.") Thus, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106–07 (1976); *see Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990). "[A] difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citation omitted).

To establish deliberate indifference, a plaintiff must show two things. First, he must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). Second, he must show that the defendant's response to the serious medical need was

- 8 -

deliberately indifferent. *Id.* at 1060. "This second prong—defendant's response to the need was deliberately indifferent—is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

Zolnierz maintains that Dr. Rao was deliberately indifferent with respect to Zolnierz's diabetes and hepatic encephalopathy/high blood ammonia levels. Zolnierz does not contest summary judgment on his claim that he should have received Interferon treatment, and the Court grants summary judgment on that claim in favor of Dr. Rao.[2]

### 1. Diabetes Care

Zolnierz maintains that Dr. Rao was deliberately indifferent to his diabetes. Diabetes qualifies as a serious medical need for purposes of the Eighth Amendment. *Lolli v. Cnty. of Orange*, 351 F.3d 410, 419–20 (9th Cir. 2003). The next question is whether Dr. Rao knew of Zolnierz's diabetic condition. There is no dispute that she did. Zolnierz informed CHS personnel at his Intake Screening that he had been diagnosed with Type II diabetes and CHS personnel informed Dr. Rao of that diagnosis. Dr. Rao verified this diagnosis by reviewing his outside medical records and prescriptions. Dr. Rao was therefore aware of Zolnierz's potentially serious medical need.

"To have acted with deliberate indifference, however, [Dr. Rao] also must have inferred from this information that [Zolnierz] was at serious risk of harm if he did not receive [treatment]." *Lolli*, 351 F.3d at 420. The evidence, which Zolnierz is unable to successfully challenge, shows that Zolnierz was not at serious risk of harm. The core of Zolnierz's deliberate indifference claim as it relates to his diabetes is that Dr. Rao should

---

[2] Zolnierz tangentially claims in his Response that "Dr. Rao refused to provide Zolnierz with his pre-incarceration prescription of Atenolol, a medication for high blood pressure, in the dosage prescribed by his treating physician." (Doc. 224 at 2.) Zolnierz does not press this alleged failure as a basis for denying the Motion for Summary Judgment in the body of the Response, and has filed a Notice that he intends to withdraw any claim related to Dr. Rao's provision of blood pressure medication. (Doc. 248.) Consequently, there is no deliberate indifference claim arising of the alleged high blood pressure condition.

- 9 -

have provided him with his pre-incarceration prescription of Metformin and should have regularly monitored his blood sugar levels. The evidence uniformly shows, however, that Dr. Rao monitored Zolnierz's blood sugar levels and that those levels were in normal ranges. For the initial period following Zolnierz's incarceration in the Jail, CHS nurses conducted daily blood sugar checks (Accuchecks). Dr. Rao examined those blood sugar levels a few weeks after Zolnierz checked into the Jail and determined that his blood glucose levels were normal, and she continued to monitor his blood sugar levels over the course of his stay in the Jail.

Zolnierz, however, contends that his blood glucose levels were out of range, and cites several medical charts over the course of his stay that report blood sugar levels of 110, 117, 119, 134, 142, and 187. (Doc. 226-1, Ex. 2 at MC-CHS-00100, -00106, -00339, -00343.) On these charts, two of the levels cited by Zolnierz are marked with an "H" and refer to a "reference range" of 65–99 mg/dL in a fasting state. (*Id.* at MC-CHS-00100, -00106.) The others have no specific designation. Zolnierz asserts that these scores "exceeded laboratory reference ranges" and therefore show that his blood sugar levels were not within normal ranges.[3] But outside of these bare assertions, Zolnierz has provided no evidence or testimony to support his interpretation of the significance of these levels. In contrast, Dr. Rao has testified that Zolnierz's scores were within normal ranges, and has buttressed that interpretation with the testimony of two other doctors who agree. Dr. Bruce A. Bethancourt, an internal medicine specialist, opined that Zolnierz's blood sugars were "consistently within normal range," and that the records "consistently showed blood sugar levels within normal limits." (Doc. 186 ¶ 6(b)–(c); Doc. 226 ¶ 6.) Dr. Jeffrey Alvarez, the current CHS Medical Director and a licensed physician, likewise stated that "[t]here was no medical need to manage diabetes in a patient such as Mr.

---

[3] Zolnierz claims there is a genuine dispute about whether the tests were conducted while he was in a fasting or non-fasting state. The records are not clear on this question, but, as discussed later, every doctor who has reviewed Zolnierz's blood sugar test results agrees that his levels were normal, regardless of what fasting state he was in.

- 10 -

Zolnierz with consistently stable blood sugars." (Doc. 186 ¶ 7(c), (j); Doc. 226 ¶ 7.) In the face of testimony from three physicians who all interpret Zolnierz's blood sugar results to be consistently normal, Zolnierz cannot cite medical record excerpts without explanation to create a genuine issue of material fact.[4] *Cf. Conroy v. Avalos*, CV08-00210PHX-MHMECV, 2010 WL 1268150 at *6 (D. Ariz. Mar. 30, 2010) ("To the extent that Plaintiff contends his medical records support his position, they require interpretation by an expert, and it was incumbent upon Plaintiff to provide an affidavit or deposition of an expert to establish the appropriate standard of care.").

Neither can Zolnierz create a factual dispute regarding the presence or absence of high blood sugar levels by simply claiming that he experiences painful symptoms, such as cramps, numbness, fluid retention in his legs, and muscle seizures when his blood sugar is high and that he experienced these symptoms on several occasions while in the Jail. Zolnierz lacks the expertise to give an opinion on whether or not his blood sugar levels were elevated at a given period or not. While he may testify that he experienced certain symptoms—and the Court has accepted that testimony for purposes of summary judgment—Zolnierz cannot opine on the proper diagnosis for those symptoms. The medical evidence in the record shows that Zolnierz's blood sugar levels were in normal range during his time at the Jail.

Because his blood sugar levels were within normal ranges, Zolnierz's specific allegations of deliberate indifference fail. With normal blood sugar levels, he was not "at

---

[4] Dr. Rao has cited an article from the American Diabetes Association which claims that "[c]riteria for the diagnosis of diabetes" include "[s]ymptoms of hyperglycemia and a casual (random) plasma glucose > 200 mg/dl (11.1 mmol/l). Casual (random) is defined as any time of day without regard to time since last meal." American Diabetes Association, *Standards of Medical Care in Diabetes*—2009, Diabetes Care, January 2009, at S14, http://care.diabetesjournals.org/content/32/Supplement_1/S13.full pdf+html. Subsequently, counsel for Zolnierz cited at oral argument another chart from the American Diabetes Association that allegedly showed that blood glucose levels less than 200mg/dl can be problematic for an individual who has already been diagnosed with diabetes. Both Parties ask the Court to take judicial notice of these facts. The Court, however, cannot take judicial notice of these documents. As the dispute between the Parties shows, the appropriate blood glucose levels of a diabetic are not "[w]ell-known medical facts." *Barnes v. Indep. Auto. Dealders Ass'n of Cal. Health & Welfare Benefit Plan*, 64 F.3d 1389, 1395 n.2 (9th Cir. 1995).

- 11 -

serious risk of harm if he did not receive [treatment]." *Lolli*, 351 F.3d at 420. Thus his claim that Dr. Rao was deliberately indifferent for not enrolling him in the CHS Chronic Disease Program upon learning that he had been diagnosed with diabetes falls short. As an initial matter, Dr. Mullany, not Dr. Rao, made that decision. (Doc. 186-4, Ex. 3 (Ex. A) at MC-CHS-0027.) And in the face of normal blood sugar levels, Dr. Rao was not deliberately indifferent for failing to subsequently enroll Zolnierz in the program.

Similarly, Zolnierz's claims that Dr. Rao was deliberately indifferent by telling CHS nurses to inform him that his blood sugars were normal when they were not and by failing to provide Zolnierz with Metformin cannot succeed on the evidence in the record. In the absence of elevated blood sugar levels, Dr. Rao's decisions did not amount to a disregard for an excessive risk to Zolnierz's safety. *See Farmer*, 511 U.S. at 834.

Finally, Dr. Rao's decision to not reinstate regular blood sugar monitoring was not deliberate indifference on this record. First, it was usually CHS staff that responded to Zolnierz's requests, including those for regular monitoring. (Doc. 186-2, Ex. 2 (Ex. A) at MCSO 00016 (1/25/09 request); *id.* at MCSO 00020 (1/08/09 request—same as previous); Doc. 186-15, Ex. 3 (Ex. A) at MC-CHS-00373 (4/3/09)). There is no evidence that Dr. Rao controls the CHS staff, and their actions consequently cannot be imputed back to her. Second, Dr. Rao continued to monitor—although not daily—Zolnierz's blood sugar levels during his stay. There were seven CMPs during Zolnierz's stay, all of which apparently showed normal blood sugar levels.

In sum, Zolnierz has not created a genuine issue of material fact as to the presence of elevated blood sugar levels. The uncontroverted medical evidence is that his blood sugar levels were normal and Dr. Rao's actions were not deliberately indifferent on that evidence. The record shows that Dr. Rao conducted medical exams and lab reviews in response to Zolnierz's requests, and reviewed those findings with Zolnierz in person.

### 2.   **Hepatic Encephalopathy/High Blood Ammonia Levels**

Zolnierz next contends that Dr. Rao was deliberately indifferent to his high blood

ammonia levels. Abnormally high blood ammonia levels can qualify as a serious medical condition for purposes of the Eighth Amendment. *See Johnson v. Schwarzenegger*, 366 Fed. App'x 767, 770 (9th Cir. 2010). A blood ammonia test on June 24, 2009, showed an elevated ammonia level. Dr. Cohen, Zolnierz's treating gastroenterologist, testified that elevated ammonia levels alone are not diagnostic of hepatic encephalopathy and would not require prescribing Lactulose or serial ammonia screening. (Doc. 186 ¶ 66; Doc. 225 ¶ 66.) Elevated ammonia levels, however, can be suggestive of hepatic encephalopathy if accompanied by a lack of alertness, cognition problems, bad or musty breath, and variations in neurologic function. (Doc. 186-23, Ex. 6 (Cohen Dep.) at 75:7–21.)

  Dr. Rao reviewed the June 24 test and met with Zolnierz to ascertain whether he was suffering from hepatic encephalopathy. Upon examination after the elevated ammonia level and meeting with Zolnierz, Dr. Rao noted that Zolnierz "denie[d] any confusion, agitation or change in mental status or functioning." He presented as "afebrile, alert and oriented x 3, no acute distress, no confusion/agitation/lethargy/somnolence." (*Id.* at MC-CHS-0060–62.) Dr. Rao determined that Zolnierz did not present with clinical hepatic encephalopathy but may have subclinical hepatic encephalopathy, psychiatric issues, or some combination. (*Id.* at MC-CHS-0062.) She followed up on July 16, and again noted that Zolnierz appeared normal. (*Id.* at MC-CHS-0065–66.)

  Zolnierz, however, has stated that he in fact often experienced difficulty thinking, confusion, delirium, an inability to bathe and engage in other activities of hygiene and self-care without assistance, and urinary incontinence while at the Jail. (Doc. 226-1, Ex. 1 (Zolnierz Decl.) ¶ 12.) That statement does not create a genuine issue of material fact as to Dr. Rao's knowledge of those symptoms. Zolnierz does not assert that he reported those symptoms to her. A deliberate indifference claim lies where a doctor is aware of and then ignores a serious medical need. *See Lolli*, 351 F.3d at 419–20. That Dr. Rao noted on July 9, 2009, that Zolnierz's "baseline level of functioning" was being affected by "underlying [psychiatric] issues/subclinical hepatic encephalopathy or combination of

two" does not establish a genuine dispute of material fact as to the Dr. Rao's awareness of cognitive difficulties contemporaneous with the elevated ammonia level. (Doc. 186-5, Ex. 3 (Ex. A) at MC-CHS-00062.) There is no dispute that Zolnierz had suffered from mental illness, but those previous episodes have not been connected to the one-time elevated blood ammonia level. As the record stands, the undisputed evidence is that Dr. Rao did not observe and Zolnierz did not report cognitive issues.

What happened next is a matter of genuine dispute. Dr. Rao claims that she offered to prescribe Lactulose to Zolnierz, but he refused. Zolnierz, however, "does not recall Dr. Rao offering [him] lactulose, explaining how lactulose works, or explaining to me the risks of not taking lactulose, such as a worsening of the symptoms associated with hepatic encephalopathy. Had Dr. Rao offered [him] lactulose, [he] would have taken it." (Doc. 226-1, Ex. 1 (Zolnierz Decl.) ¶ 13.) Dr. Rao's cited cases are inapposite. Those cases addressed whether a party's statement "on information and belief" sufficed to create a genuine issue of material fact, not whether a party's statement that he did not recall an event could create a genuine dispute of material fact. *See, e.g.*, *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1529 (9th Cir. 1991); *Taylor v. List*, 880 F.2d 1040, 1045 n.3 (9th Cir.1989). As this is a Motion for Summary Judgment, the Court assumes that Zolnierz is correct and Dr. Rao did not offer Lactulose, and therefore does not address the Parties' dispute regarding the documentation of Zolnierz's alleged refusal.

Even assuming that Dr. Rao did not offer Lactulose, she was not deliberately indifferent. Elevated blood ammonia levels are not sufficient, by themselves, to show the presence of hepatic encephalopathy. Dr. Rao met with Zolnierz and did not observe any other abnormalities. While Zolnierz has a history of mental illness, he did not present with specific symptoms at the time Dr. Rao examined him in response to the elevated result. She continued to monitor Zolnierz's blood ammonia levels through subsequent CMPs and did not observe any subsequent elevated levels. Drs. Bethancourt and Alvarez

both opined that Dr. Rao's response to the single elevated blood ammonia level was medically reasonable. (Doc. 186 ¶¶ 6(a), (b), (d), (e), (k)–(n), 7(b), (d), (j), (k); Doc. 225 ¶¶ 6, 7.) According to Dr. Bethancourt, the medical evidence showed that Zolnierz did not present with overt hepatic encephalopathy.[5] (Doc. 186 ¶ 6(e); Doc. 224 ¶ 6.) While failure to provide medication to prevent a life-threatening condition may amount to deliberate indifference to a serious medical need, see *Gibson v. County of Washoe*, 290 F.3d 1175, 1194 (9th Cir. 2002), there is no genuine dispute of material fact regarding Zolnierz's medical condition, or Dr. Rao's response. He presented a single elevated blood ammonia level. There is no evidence that such a result portends a life-threatening, serious condition, thus Dr. Rao's response to the condition as presented to her does not constitute deliberate indifference.

Zolnierz relies heavily on the fact that he was subsequently hospitalized for hepatic encephalopathy twelve days after his arrival to the ADOC in November. (Doc. 226-1, Ex. 12 at MC-00297, MC-00301.) That hospitalization, however, bears little relevance to the question of whether Dr. Rao was deliberately indifferent to Zolnierz's needs in June, when he had a single instance of elevated blood ammonia levels and otherwise presented normally. Consequently, there is no genuine dispute of material fact regarding Dr. Rao's treatment for Zolnierz's liver problems and summary judgment in her favor is warranted.

## CONCLUSION

There is no genuine dispute of material fact regarding Dr. Rao's treatment of Zolnierz at the Jail. On those undisputed facts, her treatment did not amount to deliberate indifference and summary judgment is granted in Dr. Rao's favor.

/ / /

/ / /

---

[5] While both doctors assumed Dr. Rao offered Lactulose, Dr. Bethancourt specifically opined that offering Lactulose would exceed the standard of care given the medical evidence. (Doc. 186 ¶ 6(e); Doc. 224 ¶ 6.).

**IT IS THEREFORE ORDERED** that Dr. Rao's Motion for Summary Judgment is **GRANTED**. (Doc. 185.) The Clerk of Court is directed to enter judgment in favor of Dr. Rao in this matter and Zolnierz shall take nothing.

Dated this 21st day of August, 2013.

*A. Murray Snow*
/G. Murray Snow
United States District Judge